**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>SSM HEALTH CARE CORPORATION d/b/a SSM HEALTH,<br>Defendant. | CASE NO. 4:23-cv-22-SRC<br><br>The Honorable Stephen R. Clark |

**DEFENDANT SSM HEALTH'S OPPOSITION BRIEF**
**TO PLAINTIFF'S MOTION TO REMAND**

# TABLE OF CONTENTS


**Page**

**INTRODUCTION......1**

**FACTUAL BACKGROUND......2**

**ARGUMENT......4**

**I. THE COURT HAS JURISDICTION OVER THIS CASE UNDER THE CLASS ACTION FAIRNESS ACT OF 2005......4**

A. Plaintiff Did Not Limit His Putative Class to All *Current* Missouri Citizens; Instead, Plaintiff Proposed a Backward-Looking Class. ......5

B. Plaintiff Did Not Limit His Putative Class Definition to "Current" Missouri Citizens. ......7

C. Plaintiff Presented No Evidence to Meet His Burden to Show the Home State or Local Controversy Exceptions to CAFA Jurisdiction Apply. ......8

**II. THIS COURT HAS JURISDICTION OVER THIS CASE UNDER 28 U.S.C. § 1442(a)(1). ......9**

A. The Federal Government's Mission to Make Health Records Available to Patient Online Through Patient Portals......10

B. The *BJC* Court Incorrectly Interpreted 28 U.S.C. § 1442(a)(1) in Granting Plaintiffs' Motion to Remand ......12

C. SSM Has Colorable Federal Defenses to Plaintiff's Claims, Including Specifically with Respect to the Patient Portal. ......17

D. SSM Health Was Not Required to Present Evidence In Support of SSM Health's Removal Notice, and Is Doing So Now. ......19

**CONCLUSION ......20**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson, trustee of the Diane L. Anderson Revocable Trust v. Davis Wright Tremaine LLP*,
2021 WL 7184127 (D. Or. July 14, 2021) ....7, 8

*Anthony v. Small Tube Manuf. Corp.*,
535 F. Supp. 2d 506 (E.D. Pa. 2007) ....9

*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) ....13

*Bor-Son Building Corp.*, 572 F.2d 174 (8th Cir. 1978) ....10

*Butler v. Coast Elec. Power Ass'n*,
926 F.3d 190 (5th Cir. 2019) ....12

*Caver v. Cent. Al. Elec. Coop.*,
845 F.3d 1135 (11th Cir. 2017) ....12

*Cessna v. Rea Ener. Coop., Inc.*,
753 F. App'x 124 (3d Cir. 2018) ....12

*In re Commonwealth's Motion to Appoint Counsel*,
790 F.3d 457 (3d Cir. 2015)....13, 18

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
574 U.S. 81 (2014)....20

*Doe v. ProMedica Health Sys., Inc.*,
2020 WL 7705627 (N.D. Ohio Oct. 30, 2020) ....10, 12

*Doe v. UPMC*,
2020 WL 4381675 (W.D. Pa. Jul. 31, 2020) ....10, 12

*Growers 1-7 v. Ocean Spray Cranberries*,
2016 WL 10849499 (D. Mass. May 10, 2016)....5

*Hargett v. RevClaims, LLC*,
854 F.3d 962 (8th Cir. 2017) ....4, 7

*Hood v. Gilster-Mary Lee Corp.*,
785 F.3d 263 (8th Cir. 2015) ....8

*Isaacson v. Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008)....................13

*Jacks v. Meridian Resource Co., LLC*,
701 F.3d 1224 (8th Cir. 2012) ....................13, 14

*Jeff D. v. Andrus*,
899 F.2d 753 (9th Cir. 1989) ....................5

*Jefferson Cty., Ala. v. Acker*,
527 U.S. 423 (1999)....................17

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) ....................14

*Leflar v. Target Corp.*,
57 F.4th 600 (8th Cir. 2023) ....................4, 8

*Mesa v. California*,
489 U.S. 121 (1989)....................10, 17

*Mondragon v. Cap. One Auto Fin.*,
736 F.3d 880 (9th Cir. 2013) ....................7

*Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*,
475 U.S. 1 (1986)....................19

*Packingham v. North Carolina*,
137 S.Ct. 1730 (2017)....................19

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997)....................19

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ....................15

*Smith v. Facebook*,
745 F. App'x 8 (9th Cir. 2018) ....................18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................19

*Standard Fire Ins. Co. v. Knowles*,
568 U.S. 588 (2013)....................4, 5

*Stephenson v. Nassif*,
160 F. Supp. 3d 884 (E.D. Va. 2015) ....................12

*Summerhill v. Terminix, Inc.*,
2008 WL 4809448 (E.D. Ark. Oct. 30, 2008) ....................9

*Tennessee v. Davis*,
100 U.S. 257 (1879)....................10

*United States v. Kidd*,
23 F.4th 781 (8th Cir. 2022) ....................6

*United States v. Shaw*,
957 F.3d 734 (7th Cir. 2020) ....................6

*United States v. Todd*,
245 F.3d 691 (8th Cir. 2001) ....................17, 18

*Watson v. Philip Morris Cos., Inc.*,
551 U.S. 142 (2007).................... *passim*

*Willingham v. Morgan*,
395 U.S. 402 (1969)....................10

**Statutes & Rules**

28 U.S.C. 1332....................5, 7

28 U.S.C. 1442.................... *passim*

42 C.F.R. § 495.20....................15

45 C.F.R. § 164.508....................4, 17

45 C.F.R. § 164.514....................4, 17

## INTRODUCTION

Plaintiff John Doe spends the vast majority of his motion to remand focused on federal officer removal. There were two grounds for SSM's removal notice, however. SSM removed the case not only under 28 U.S.C. § 1442(a)(1), but also under the Class Action Fairness Act.

On this latter point, plaintiff claims that the Class Action Fairness Act does not apply because the class definition is limited to "all Missouri citizens." (Mot. 28.) It is not. That language is qualified by an initial temporal modifier: "*During the fullest period allowed by law*." (Dkt. 1-1, Pet. ¶ 150.) The natural reading of this class definition, particularly when placed in context of its surrounding allegations, is that a Missouri citizen remains part of the putative class, even if they have subsequently domiciled in another state. And plaintiff presents no evidence—*none*—to show why, under this interpretation, more than 2/3 of the class would continue to be Missouri citizens at the time the complaint was filed. This case belongs in federal court for this reason alone.

With respect to federal officer removal under 28 U.S.C. § 1442(a)(1), plaintiff's motion does not contest this indisputable fact: plaintiff claims it is a violation of Missouri's Wiretap Act every time someone clicks on the link to their patient portal contained on SSM's website. (*Id.*, ¶ 185(i), (j).) The claims in this case thus also relate to actions taken by SSM Health to fulfill a clear federal policy of increasing patient access to electronic health records, a policy that the federal government induced SSM Health and other health care providers to carry out through the power of the purse. SSM Health acted in response to this federal command and is now facing substantial liability from plaintiffs under Missouri state law for these actions. The purpose of the federal officer removal statute, from its inception, was to provide a federal forum for such claims.

Accordingly, for these and the other reasons set forth below, the Court should deny plaintiff's motion to remand.

## FACTUAL BACKGROUND

This is a website privacy case. The basis for plaintiff's complaint is that it is illegal under Missouri law for SSM and other health care providers to use the Meta Pixel, a common website analytics tool which helps to measure the effectiveness of a company's advertising on Facebook. Plaintiff's complaint does not allege that it is illegal for SSM Health or other health care providers to advertise on Facebook *per se*, but only that it is illegal for them to then use common analytical tools to measure the effectiveness of these advertisements.

Plaintiff claims this is so because, in connection with this Meta Pixel use, certain internet metadata may or may not be transferred to Facebook. This includes internet protocol (IP) addresses (Dkt. 1-1, Pet. ¶¶ 31-32), internet "cookies" (*id.* ¶¶ 33-35), "browser fingerprints," (*id.* ¶¶ 37-39), and "unique user identifiers" such as "Facebook ID" (*id.* ¶¶ 40-41).

SSM's website contains a patient portal for patients and their caretakers to log in their MyChart patient portal accounts to view their health records online, available at the following link: https://www.ssmhealth.com/mychart. (Dkt. 1, Rem. Not. ¶ 4.) Nearly every page of SSM Health's website, www.ssmhealth.com, links directly to the SSM Health MyChart patient portal. (*Id.*) An image of the MyChart patient portal website is set forth below:



In his motion, plaintiff argues that "Plaintiff's lawsuit has no relationship to EHR, patient portals, or access to patient portals." (Mot. 13.) This is not correct. Numerous of plaintiff's counts are directly targeted toward this patient portal link, including the following:

1. *Count I: Interception of Wire Communications in Violation of Mo. Rev. Stat. § 542.402.*

In Count I of the petition, plaintiff alleges that SSM Health violates the Missouri Wiretap Act every time an individual clicks any link on SSM Health's website containing the Meta Pixel, including the patient portal link. As plaintiff alleges specifically here: SSM Health "aided in the interception" of, *inter alia*: "*Log-Ins*, Registrations, Requests for Appointments, Search, and other buttons." (Dkt. 1-1, ¶ 185(i) (emphasis added).). This also includes "[t]he precise dates and times when patients click to *Log-In* on Defendant's websites." (*Id.*, ¶ 185(j) (emphasis added).)

2. *Count II: Tampering with Computer Data in Violation of Mo. Rev. Stat. §§ 569.095 & 537.525.*

In Count II, plaintiff alleges that SSM committed the Missouri state law offense of tampering with computer data by "knowingly and without authorization" disclosing data "residing or existing internal or external to a computer, computer system, or computer network." (*Id.*, ¶ 194 (quoting Mo. Rev. Stat. § 569.095).) Here again, this information allegedly included information about "treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, *and logins to Defendant's website*." (*Id.*, ¶ 201 (emphasis added).)

3. *Count VI: Unlawful Practices in Violation of Mo. Rev. Stat. § 407.020*.

In Count VI, parroting similar allegations, plaintiff again alleges that SSM violated the Missouri Merchandising Practices Act by disclosing, allegedly without authorization, "Plaintiff and Class Members' statuses as patients of Defendants," as well as the "exact content of communications exchanged between Plaintiff and/or Class Members with Defendant," including related to "*logins to Defendant's website*." (*Id.*, ¶ 272 (emphasis added).)

Plaintiff further alleges that SSM Health violated federal law to support his claims. Specifically, plaintiff alleges that "personally identifying information such as patient names, IP addresses, and other unique characteristics or codes" are protected health information under 45 C.F.R. § 164.514 of the HIPAA regulations. (*Id.*, ¶ 105.) From there, plaintiff alleges that SSM Health violated the HIPAA regulation prohibiting disclosures of protected health information for marketing purposes without authorization. (*Id.*, ¶¶ 97, 169 (citing 45 C.F.R. § 164.508(a)(1).). These allegations are incorporated by reference into each of plaintiff's counts. (*Id.*, ¶¶ 164, 192, 215, 223, 257, 265, 284, 299, 318 (each "re-alleg[ing] and incorporat[ing] by reference all paragraphs above as if fully set forth herein").)

Plaintiff seeks to represent a putative class in pursuing these claims, defined as follows: "*During the fullest period allowed by law*, all Missouri citizens [1] who are, or were, patients of SSM Health Care Corporation, or any of its affiliates and [2] who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website that [3] caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook." (*Id.*, ¶ 150).

## ARGUMENT

### I. THE COURT HAS JURISDICTION OVER THIS CASE UNDER THE CLASS ACTION FAIRNESS ACT OF 2005.

"Special diversity-jurisdiction rules apply in class actions." *Leflar v. Target Corp.*, 57 F.4th 600, 603 (8th Cir. 2023). These rules reflect "Congress's desire for broad diversity over class actions," *Hargett v. RevClaims, LLC*, 854 F.3d 962, 965 (8th Cir. 2017)—the Class Action Fairness Act of 2005's (CAFA) "primary objective" was to ensure "Federal court consideration of interstate cases of national importance." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (quoting § 2(b)(2), 119 Stat. 5).

CAFA thus "provides the federal courts with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" *Id.* at 592 (quoting 28 U.S.C. § 1332(d)(2), (d)(5)(B)). Where CAFA jurisdiction is challenged, "the removing party bears the burden by a preponderance of the evidence that the case meets each one of the requirements." *Id.*

**A. Plaintiff Did Not Limit His Putative Class to All *Current* Missouri Citizens; Instead, Plaintiff Proposed a Backward-Looking Class.**

Here, the parties dispute only one of CAFA's three threshold requirements: whether minimal diversity exists between SSM Health and the putative class. (Mot. 27-29.) For his part, plaintiff argues "there is no diversity between the proposed class and SSM" because "Plaintiff's Proposed Class is self-limited to Missouri citizens." (*Id.* at 27.)

SSM Health does not dispute that on its face plaintiff's proposed class definition is limited to "all Missouri citizens." (Dkt. 1-1, Pet. ¶ 150.) Here is the rub: the phrase contains an important temporal qualifier: "[*d*]*uring the fullest period allowed by law*." (*Id.* (emphasis added).) The natural reading of this phrasing is that the putative class is comprised of any individual who was a Missouri citizen during the fullest period allowed by law, regardless of whether they have subsequently domiciled elsewhere, so long as they can meet the other requirements for being a member of the putative class: (1) that they are, or *were*, SSM Health patients, (2) that they exchanged communications with SSM Health through ssmhealth.com, and (3) that allegedly caused disclosures of their patient personally identifiable data to Facebook. (*Id.*)

This reading of the putative class definition is consistent with the rules of interpretation. *See Growers 1-7 v. Ocean Spray Cranberries*, 2016 WL 10849499, at *3 (D. Mass. May 10, 2016) (holding that "[c]onstrual of class definitions follows principles of contractual and statutory interpretation") (citing *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989) (in turn holding that

"[t]he district court construes the language of a class definition in much the same way that it might construe the language of a contract or a statute")).

"[U]nder the nearest-reasonable-referent canon, we presume a modifier refers to the nearest reasonable referent"; for this reason: "'modifiers should come, if possible, next to the words they modify.'" *United States v. Shaw*, 957 F.3d 734, 739 (7th Cir. 2020) (quoting William Strunk Jr. & E.B. White, The Elements of Style 30 (50th Anniversary ed. 2009)); *see also, e.g.,* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 152-53 (2012) ("[w]hen the syntax involves something other than a parallel series of nouns of verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").

This temporal interpretation of the putative class also follows from plaintiff's preceding allegations. (Dkt. 1-1, Pet. ¶¶ 141-145 ("**<u>TOLLING, CONCEALMENT, AND ESTOPPEL</u>**") (emphasis in original).) The allegations contained in these paragraphs make plain that the claims in this action should be construed and applied as broadly as possible. Plaintiff alleges the "applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein" (*id.*, ¶ 141); that "Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel" (*id.*, ¶ 143); that "Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so" (*id.*); and thus also that "Defendant is therefore estopped from relying on any statute of limitations defenses" (*id.*, ¶ 145).

These broad temporal allegations also point to a broad interpretation of the putative class, rather than the more limited interpretation that plaintiffs have proposed. *Cf., e.g., United States v. Kidd*, 23 F.4th 781, 783 (8th Cir. 2022) ("It is a general principle of statutory interpretation that

the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.") (quotation omitted).

### B. Plaintiff Did Not Limit His Putative Class Definition to "Current" Missouri Citizens.

Plaintiff does not undertake this textual analysis in his motion to remand. Plaintiff instead asks the Court to skip over any interpretation of the class definition language, because under 28 U.S.C. 1332(d)(7) "citizenship is determined at the time the complaint was filed." (Mot. 28.)

This statutory language, however, does not purport to define the scope of who is or is not a member of the putative class in the first instance. Rather, the language only speaks to the point at which citizenship "of the members *of the proposed classes* shall be determined" for purposes of undertaking the CAFA jurisdictional analysis. 28 U.S.C. § 1332(d)(7) (emphasis added). The language thus sets in place a time for determining minimal diversity under the statute, as Congress recognized "class membership could change during the course of the litigation." *Anderson, trustee of the Diane L. Anderson Revocable Trust v. Davis Wright Tremaine LLP*, 2021 WL 7184127, at *4-5 (D. Or. July 14, 2021) (magistrate), *aff'd* 2022 WL 562024, at *1 (D. Or. Feb. 23, 2022) (quotation omitted, rejecting same argument).

Plaintiff argues the District of Oregon's decision in "*Anderson* is contrary to Eighth Circuit law," because in *Hargett v. RevClaims LLC*, 854 F.3d 962, 966 (8th Cir. 2017), the Eighth Circuit held that plaintiffs could avoid federal jurisdiction "through a class explicitly limited to local citizens[.]" *Id.* at 966. The Ninth Circuit follows this same rule, however. *See Anderson*, 2021 WL 7184127, at *5 (discussing *Mondragon v. Cap. One Auto Fin.*, 736 F.3d 880, 885 (9th Cir. 2013)). The rule does not solve plaintiff's problem here, just as it did not solve the plaintiffs' problem in *Anderson*. This is because the proposed class definitions in both cases on their face are backward-looking with respect to this citizenship language. *Cf. Anderson*, 2021 WL 7184127, at *1

(proposed class consisted of "each Oregon citizen *who was sold* a security issued by American Equities") (emphasis added), *with* Pet. ¶ 150 (proposed class consists of "all Missouri citizens," "*during the fullest period allowed by law*") (emphasis added).)

As the court held: "Plaintiffs assert the Class is limited to 'current Oregon citizens' even though they did not include the word 'current' in their Class definition." 2021 WL 7184127, at *5. Thus also, federal jurisdiction is appropriate because "individuals who were Oregon citizens and sold securities who moved to another state prior to removal are members of the Class but are considered citizens of their new states for the purposes of minimal diversity under CAFA." *Id.*

### C. Plaintiff Presented No Evidence to Meet His Burden to Show the Home State or Local Controversy Exceptions to CAFA Jurisdiction Apply.

Finally, plaintiff argues that even if SSM Health is right in its interpretation of the proposed class definition that would not determine the CAFA jurisdictional analysis, because then either the home state or local controversy exceptions to CAFA jurisdiction would apply. (Mot. 29-30.)

It is the plaintiff's burden of *proof* on this point, however: "The party seeking remand bears the burden of proof for a CAFA exception." *Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263, 265 (8th Cir. 2015). "Any doubt about the applicability of the local-controversy exception is resolved against the party seeking remand." *Id.*

Here, plaintiff does not present any evidence to show that more than two-thirds of his proposed putative class "*might*" no longer be domiciled in Missouri. *See Leflar*, 57 F.4th at 603 (analyzing pleading and evidentiary burdens for CAFA removal). Instead, plaintiff repeats his argument that the class is limited to current Missouri citizens, as a textual matter. (Mot. 30.)

As set forth above, this interpretation is not correct. And basic state-to-state migration patterns establish that many members of plaintiff's putative class might once have been, but no longer remain, domiciled in Missouri. The most recent available data from the Census Bureau

American Community Survey on state-to-state migration show that more than 1.2 million individuals (1,214,293 million) have moved from Missouri to other states between 2012 and 2019 alone. (Ex. A, State of Missouri Data Migration Screenshots.) This includes 117,423 migrations between Missouri and Illinois, where SSM Health also has hospitals located, as shown through plaintiff's petition. (*See* Dkt. 1-1, Pet. ¶ 7 (allegations regarding SSM Health St. Mary's Hospital-Centralia and SSM Health Good Samaritan Hospital-Mt. Vernon).)

It is thus not beyond a "legal impossibility" that 2/3 of the class might have once been domiciled in Missouri, at the time they "are, *or were*, an SSM patient," but now be domiciled in some other state. This Court therefore has jurisdiction over this case under CAFA. *Summerhill v. Terminix, Inc.*, 2008 WL 4809448, at *3 (E.D. Ark. Oct. 30, 2008) (denying CAFA remand where "Plaintiff's theory requires the Court to assume that persons who were Arkansas citizens at the time of contracting remained Arkansas citizens"; "the Court agrees with the holding of another district court that 'a mere assertion that the putative class is composed of citizens of a particular state is insufficient to satisfy the burden of proof required to invoke a CAFA exception'") (quoting *Anthony v. Small Tube Manuf. Corp.*, 535 F. Supp. 2d 506, 515 (E.D. Pa. 2007)).

## II. THIS COURT HAS JURISDICTION OVER THIS CASE UNDER 28 U.S.C. § 1442(a)(1).

Congress has also provided this Court with jurisdiction over this case under the federal officer removal statute. Specifically, 28 U.S.C. § 1442(a)(1) provides as follows:

> A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: (1) The United States or any agency thereof (*or any person acting under that officer*) of the United States or any agency thereof, in an official or individual capacity, *for or relating to any act under color of such office*. . . .

28 U.S.C. § 1442(a)(1) (emphasis added).

The statute has a lineage going back more than 200 years. *Tennessee v. Davis*, 100 U.S. 257, 267 (1879); *Willingham v. Morgan*, 395 U.S. 402, 405 (1969) ("The federal officer removal statute has had a long history."); *Mesa v. California*, 489 U.S. 121, 125-26 (1989); *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147-48 (2007) (same).

Jurisdiction is grounded in important federal interests. The federal government "can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection—if their protection must be left to the action of the State court—the operations of the general government may at any time be arrested at the will of one its members." *Davis*, 100 U.S. at 263.

Federal jurisdiction thus rests on the basic "federal interest in the matter," the "very basic interest of the enforcement of federal law through federal officials." *Willingham*, 395 U.S. at 406; *see also Bor-Son Building Corp.*, 572 F.2d 174, 181 (8th Cir. 1978) (same).

### A. The Federal Government's Mission to Make Health Records Available to Patient Online Through Patient Portals.

The first two federal courts to weigh these federal interests both allowed for removal of similar website privacy litigation under the federal officer removal statute. *See Doe v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *interlocutory appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020).

Plaintiff is correct that other courts have since rejected these decisions, including a member of this Court. (Mot. 19-22.) Respectfully, the decisions remain correct, and should be followed by the Court here. This is so because of plaintiff's allegations regarding the SSM Health MyChart

patient portal. Beginning with an Executive Order from President George W. Bush in 2004, and followed by subsequent Congressional action in 2009, the federal government made it a federal mission to electronicize health information technology. *ProMedica* 2020 WL 7705627, at *1-2. An important part of this mission was incentivizing health care providers to provide their patients with access to their health care records online. (*See* Ex. B, *Federal Health IT Strategic Plan*, 2011-2015, at pgs. 39-40 ("OBJECTIVE B: Accelerate individual and caregiver access to their electronic health information in a format they can use and reuse")). To accomplish this goal, Congress allocated billions of dollars for health care providers to comply with "meaningful use" criteria. (Dkt. 1, Rem. Not. ¶¶ 16-21.) In order to receive these payments, health care providers in turn reported on their compliance with this federal directive, including patient online access. (*Id.*, ¶ 18.)

This was not a mere compliance with the law, as in *Watson*. (Mot. 16-18.) This was a paid partnership with the federal government to produce a result that the federal government desired and could not make available without the assistance of the private sector—the health care providers who actually provide the treatment to patients and thus also hold the information that the federal government wanted to be made available to patients and their caretakers online.

As the President's Information Technology Advisory Committee initially stated in 2004: "Presidential leadership is essential to achieving the full potential of health information technology because multiple Federal departments and agencies must be coordinated in concert with the private sector, ***which delivers most of the care in our 1.6 trillion dollar health care system***." (Ex. C, President's Information Technology Advisory Committee, *Revolutionizing Health Care Through Information Technology*, at pg. 4 (June 2004).) The Office of the National Coordinator for Health Information Technology subsequently put it this way: "*[T]his is a shared undertaking*. Efforts of state, territorial, local, and tribal governments, *and private stakeholders are vital* to ensure that

health information is available when and where it matters most to improve and protect people's health and well-being." (Ex. D, *Federal Health IT Strategic Plan*, 2015-2020, at pg. 4.)

Under these facts, removal is appropriate here, even putting *UPMC* and *ProMedica* to the side. *See also, e.g.*, *Stephenson v. Nassif*, 160 F. Supp. 3d 884 (E.D. Va. 2015) (allowing removal of state law employment dispute based on compliance with federal regulations in filing confidential information red flag report); *Caver v. Cent. Al. Elec. Coop.*, 845 F.3d 1135, 1138 (11th Cir. 2017) (allowing removal of state law claims related to defendant's participation in the Rural Electrification Act; "Congress and the President designed a system by which the REA would accomplish these goals by loaning money to state entities, which would carry out these objectives under the REA's close supervision"); *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 201 (5th Cir. 2019); *Cessna v. Rea Ener. Coop., Inc.*, 753 F. App'x 124, 127 (3d Cir. 2018) (same).

As the Eastern District of Virginia stated in *Stephenson*: "[I]t is pellucid that the broad language of § 1442(a)(1) must be applied in a manner that effectuates the central congressional policy of securing a federal forum for persons who assist the federal government in a manner that risks the imposition of state law liability." *Id.* at 888. Thus, "[t]he principles of *Watson*, applied here, point persuasively to the conclusion that defendant Alliance was 'acting under' a federal officer when it submitted the JPAS incident report concerning plaintiff." *Id.*

### B. The *BJC* Court Incorrectly Interpreted 28 U.S.C. § 1442(a)(1) in Granting Plaintiffs' Motion to Remand in *BJC*.

Respectfully, SSM Health believes that the *BJC* court made three errors in the court's decision, which are now being raised on appeal before the Eighth Circuit. (*See John Doe I, et al. v. BJC Health System*, Case No. 23-1107 (8th Cir., filed Jan. 19, 2023).) ***First***, the district court took issue with the fact that BJC's participation in the Meaningful Use Program was "voluntary." *Doe v. BJC Health System*, 2023 WL 369427, at *1 n.2, 4 (E.D. Mo. Jan. 10, 2023).

This Eighth Circuit rejected a similar argument in *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S. Ct. 1532, 1543 (2021). There, the plaintiff argued that removal was improper under the federal officer removal statute because the relevant health plan documents at issue provided the defendant with discretion as to whether to pursue a subrogation claim. *Jacks*, 701 F.3d at 1233. The Court rejected this argument, explaining: "That the Plan allows the carrier the discretion to pursue subrogation does not foreclose the application of the federal officer removal statute." 701 F.3d at 1233. "To deny removal solely because the carrier is allowed discretion within a minute area contemplated by the governmental Plan defies the overall purpose and thrust of the federal officer removal statute generally." *Id.* at 1234.

The Second, Third and Seventh Circuits agree. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (rejecting district court holding that "mere assistance, in the absence of a duty to render such aid, does not bestow § 1442 jurisdiction"; "Like the Second Circuit, we 'find no authority for the suggestion that a voluntary relationship somehow voids the application of the removal statute.'") (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008)); *In re Comm.'s Mot. to Appt. Counsel*, 790 F.3d 457, 469-70 (3d Cir. 2015) (allowing removal of claims related to public defender's voluntary assistance of defendants in state court habeas proceedings).

***Second***, the *BJC* court held "these non-binding decisions apply a different test for federal officer removal tha[n] what the Eighth Circuit Court of Appeals applies," and "[t]his Court is bound to apply the law of the Eighth Circuit." *BJC Health System*, 2023 WL 369427, at *1.

The Third and Sixth Circuits do not apply a "different test for federal officer removal" than this Eighth Circuit, however. The Supreme Court authoritatively interpreted the statute's "acting under" requirement in *Watson*, 551 U.S. at 147-48, 152-53. The Court held that while compliance

with the law is not enough to meet this requirement, the statutory language is "broad" and must be "liberally construed." Thus also, there are a number of other circumstances—whether this be "any contract," or "*any payment*," or "any employer/employee relationship," or "any principal/agent arrangement," or any other "evidence of any delegation of legal authority"—that are sufficient for a private entity to justify removal, *id.* The Court concluded: "precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal supervisor." *Id.* at 152.

Every federal court is bound to apply this standard in analyzing removal, and the Eighth Circuit does. As the Eighth Circuit held in *Jacks*: "To satisfy the 'acted under' requirement of § 1442(a)(1), a private person's action 'must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." 701 F.3d at 1230 (emphasis in original, quoting *Watson*, 551 U.S. at 147); *see also Graves*, 17 F.4th at 769 ("We must apply the Court's guidance in *Watson* to 3M's relationship with the military regarding its sale of commercial earplugs to private parties such as Graves."); *Buljic*, 22 F.4th at 738 (this "threshold showing" under *Watson* "requires Tyson to establish that (1) it acted under the direction of a federal officer").

***Third***, the district court in *BJC* conflated the federal officer removal statute's acting under and causal nexus requirements—that the plaintiff's claims must be either "for" or "relating to" the defendant's actions taken under color law. 28 U.S.C. § 1442(a)(1). The statute's plain language sets forth a straightforward test: was the defendant acting under color of federal law, and, if so, are plaintiff's claims "for *or relating to*" that action taken under color of federal law?

In 2011, Congress amended the federal officer removal statute to add this "or relating to" language to broaden the permissible scope of removable claims. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291-92 (5th Cir. 2020) (en banc; holding that "[b]y the Removal

Clarification Act, Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office"); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("Before 2011, the contractor had to establish that the suit against it was '*for* a[n] act under color of office,' which the Supreme Court then characterized as a 'causal connection between the charged conduct and the asserted official authority'") (quotation omitted).

This causal nexus requirement is met here. The purpose of the Meaningful Use program was not only for health care providers to make patient portals available to their patients, but for the patients and their caretakers to actually use them. Meaningful Use participants were required to attest that "[m]ore than 5 percent of all unique patients seen by the EP during the EHR reporting period (or their authorized representatives) view, download or transmit to a third party their health information." 42 C.F.R. § 495.20(10)(ii)(B).

As the National Coordinator stated in one publication: "Just making a portal available to patients will not ensure that they use it. The portal must be engaging and user-friendly, and must support patient-centered outcomes." (Ex. E, *Patient Portal Optimization*, at pg. 1.) In a "Patient Engagement Playbook"—which was self-described as "an important tool for *our mission* to help clinicians and their patients adopt and adapt to patient portals and patient-generated health data" (Ex. F, *Patient Engagement Playbook*, at pg. 5/81 (emphasis added)—the National Coordinator told health care providers to "[u]se Playbook language *on your website* ***or Facebook page*** to let patients know how they can use the patient portal to participate in their care." (*Id.* (emphasis added).) The Playbook further told health care providers to "Market and educate effectively" (*id.*, at pg. 16/81.); to "leverage every educational opportunity" (*id.*); to "Take advantage of every touchpoint" and to "[t]ake every opportunity to promote patient portal enrollment" (*id.*).

The allegations contained in plaintiff's petition show how useful website analytical tools have been in meeting these Meaningful Use program requirements. As plaintiff puts it: "A third-party website that incorporates the Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to analyze a user's experience and activity on the website to assess the website's functionality and traffic." (Dkt. 1-1, Pet. ¶ 72.) "Meta Pixel is wildly popular and embedded on millions of websites." (*Id.*, ¶ 75.) "Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites." (*Id.*)

As shown through the image below, this includes the federal government. To this day, the government utilizes the Meta Pixel for the government's own Medicare beneficiary online portal:




As the court held in *ProMedica*: "There is plainly a connection or association between [the health care provider's] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." 2020 WL 7705627, at *3 (quoting *UPMC*, 2020 WL 4381675, at *6).

### C. SSM Has Colorable Federal Defenses to Plaintiff's Claims, Including Specifically with Respect to the Patient Portal.

The final requirement for federal officer removal is that the defendant have a colorable federal defense. The standard here is low; "[f]or a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *Graves*, 17 F.4th at 771 (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)). Moreover, when an alleged, and disputed, federal duty forms the basis for plaintiff's alleged state law claims, then removal under 28 U.S.C. 1442(a)(1) is appropriate. *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (holding that "[u]nder the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends upon federal law").

As the Supreme Court held in *Mesa v. California*, 489 U.S. 121 (1989): "To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." 489 U.S. at 130 (emphasis in original). "Both are equally defensive and equally based in federal law." *Id*.

Such is the case here. Plaintiff argues the information SSM Health allegedly transmitted to Facebook through the Meta Pixel is protected health information under HIPAA (Dkt. 1-1, Pet. ¶ 105 (citing 45 C.F.R. § 164.514)), and thus also that SSM Health allegedly violated the HIPAA regulations by disclosing his protected health information to Facebook for marketing purposes without consent (*id.*, ¶¶ 97, 169 (citing 45 C.F.R. § 164.508)). Plaintiff further re-alleges these allegations into each of his counts. (*Id.*, ¶¶ 164, 192, 215, 223, 257, 265, 284, 299, 318.)

Thus also, when plaintiff alleges "Defendant owed a duty to Plaintiff and Class Members to protect the confidentiality of their Personal Health Information and not share such information

with Facebook for marketing purposes without the express written consent Plaintiff and Class Members" (*id.*, ¶ 289), this expressly raises a question regarding the scope of SSM Health's alleged duties under federal law. As the Ninth Circuit held in a case challenging similar alleged website privacy violations stemming from the use of the Facebook "Like" button, the defense is colorable: "The district court also properly rejected Plaintiffs' claims that the collected data is subject to more stringent disclosure requirements under the Health Insurance Portability and Accountability Act of 1996 ('HIPAA') (codified as amended in scattered sections of 42 U.S.C.) and California Civil Code section 1798.91 (2014)." *Smith v. Facebook*, 745 F. App'x 8, 9 (9th Cir. 2018).

The court concluded: "Information available on the publicly accessible website stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Id.* Thus also: "Put simply, the connection between a person's browsing history and his or her own state of health is too tenuous to support Plaintiffs' contention that the disclosure requirements of HIPAA or section 1798.91 apply." *Id.*

Whoever is right and whoever is wrong on this point, this federal defense to plaintiff's state law claims—that no such duties exist under federal law, and here HIPAA in particular—provides the federal courts with jurisdiction over the petition under 28 U.S.C. § 1442(a)(1). *See Todd*, 245 F.3d at 693 (removal proper where the parties disputed the scope of the defendant's duties under the federal Freedom of Information Act; "Because we believe that § 552 at the very least plausibly shields the United States from any obligation to comply with Mr. Todd's request for its files, we find that removal was proper."); *In re Commonwealth Motion to Appoint*, 790 F.3d at 473-474 (same with respect to Civil Justice Act; "We find this to be a federal defense in that it requires

interpretation of federal statutes, the CJA and § 3599, as well as the *Guide*, which the Judicial Conference promulgated to effectuate these requirements").

SSM Health's First Amendment rights will also play a material role in this case: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)). In *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011), the Supreme Court further held that "***the creation and dissemination of information are speech within the meaning of the First Amendment***." *Id.* (emphasis added).

Thus, even assuming that there was an alleged disclosure of "personally identifiable patient information" to Facebook at issue in this case (*see, e.g.*, D.E. 1-1, Pet. ¶ 15), this dissemination of information would then have to be balanced against SSM Health's constitutional right to speak—as well as the public's right to receive this speech. As the Supreme Court has likewise held: "The constitutional guarantee of free speech serves significant societal interests apart from the speaker's interest in self-expression. By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986).

### D. SSM Health Was Not Required to Present Evidence in Support of SSM Health's Removal Notice, and Is Doing So Now.

Plaintiff argues that SSM Health was required to provide evidence in its notice of removal to show how the federal government specifically managed SSM Health's patient portal. (Mot. 6.) The Supreme Court has made plain that a notice of removal, like a complaint, does not have to be supported by evidence. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87

(2014). To the extent the Court feels evidence does need to be presented, now that jurisdiction has been challenged, *see Dart Cherokee*, 574 U.S. at 89, attached to this brief is the Declaration of Jennifer Ezzel, stating as follows: "SSM Health met Meaningful Use criteria related to patient online access of health records through the MyChart patient portal. Further, ongoing usage of the portal continues to be necessary for SSM Health providers to meet the Meaningful Use / Promoting Interoperability criteria on an annual basis." (Ex. G, Jennifer Ezzel Decl. ¶ 4.)

**CONCLUSION**

Jurisdiction is proper in federal court in this case under both the Class Action Fairness Act and under 28 U.S.C. § 1442(a)(1). The Court should deny plaintiff's motion to remand.

Dated: March 3, 2023

Respectfully submitted,

*/s/ John D. Comerford*

John D. Comerford
Adam J. Simon
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111
Email: jcomerford@dowdbennett.com
asimon@dowdbennet.com

Paul Karlsgodt (29004)
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202
Telephone: (303) 861-0600
Email: pkarlsgodt@bakerlaw.com

David A. Carney (*application for admission to Court forthcoming*)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
dcarney@bakerlaw.com

*Attorneys for Defendant SSM Health Care Corporation d/b/a SSM Health*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 3, 2023, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ John D. Comerford*
*Attorney for Defendant SSM Health Care Corporation d/b/a SSM Health*