UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:23-cv-00022-SRC |
| SSM HEALTH CARE CORPORATION, d/b/a SSM Health, | ) ) ) ) |
| Defendant. | ) ) |

**Memorandum and Order**

John Doe alleges that SSM tracks the personal data of its patients and discloses that information to third parties like Facebook, in violation of Missouri law.  To remedy this alleged invasion of privacy, Doe brings suit on behalf of all Missouri citizens whose health information SSM has allegedly divulged.  Doe filed his suit in state court, but SSM removed to federal court, urging a creative but unavailing federal-officer-removal theory, and a fraught application of the Class Action Fairness Act.  Doe now asks the Court to remand the case back to state court, arguing that no federal jurisdiction exists.

**I.      Background**

SSM is a major healthcare provider, incorporated in Missouri and with its principal office in St. Louis.  Doc. 1-1 at ¶ 7.  Doe is a citizen of Missouri, *id.* at ¶ 8, and a patient of SSM, *id.* at ¶ 11.  Doe's proposed class includes the following:

> During the fullest period allowed by law, all Missouri citizens who are, or were, patients of SSM Health Care Corporation, or any of its affiliates and who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

Doc. 1-1 at ¶ 150.  According to Doe, SSM has installed the Facebook Meta Pixel on its website.  Doc. 13 at ¶ 8.  The Meta Pixel allows websites to record a person's interactions with the website and also sends that record to Facebook, attached to the person's IP address, name, email, phone number, and Facebook user account.  Doc. 13 at ¶ 5.  According to SSM, websites that use the Meta Pixel "benefit[] from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic."  Doc. 19 at p. 21.  SSM says that "useful website analytical tools" like the Meta Pixel give healthcare providers invaluable data on how patients use the healthcare provider's website.  *Id.* at 20–21.  In turn, this data plays a crucial role in a healthcare provider's efforts to encourage patients to use the healthcare provider's website.  *Id.*  The federal government has adopted the goal of making patient health records accessible online.  *Id.* at p. 16.  To this end, Congress has established the Meaningful Use Program ("MUP"), which provides financial incentives for healthcare providers that make health records available online and effectively encourage patients to access those records.  *Id.*  SSM participates in the MUP, submitting yearly reports on the number of patients who have signed up for its online portal and receiving financial incentives.  Doc. 19-7 at ¶¶ 4, 5.

## II.     Standard

"The [removing] defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence."  *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010).  Although federal courts generally disfavor removal, "the typical presumption against removal does not apply" to federal-officer removal pursuant to 28 U.S.C. § 1442(a) because "[t]he federal officer removal statute is to be 'liberally construed.'"  *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021) (citations omitted).  Likewise, the presumption against removal

2

does not apply to removal under the Class Action Fairness Act ("CAFA"). *Leflar v. Target Corp.*, 57 F.4th 600, 604 (8th Cir. 2023). "Instead, as in any other case, a preponderance-of-the-evidence standard involves a straight-up weighing of the evidence to determine which side has the better argument." *Id.* (citation omitted). So, under both the federal-officer-removal statute and CAFA, the removing defendant must demonstrate by a preponderance of the evidence that federal courts have jurisdiction over the case, without needing to overcome a presumption against removal.

### III.    Discussion

SSM makes two arguments in support of this Court's having jurisdiction. First, SSM argues that its participation in the MUP makes it something akin to an agent of the government, allowing it to remove to federal court under federal-officer jurisdiction. Second, SSM argues that, although Doe limited his proposed class to "Missouri citizens," the class actually includes some citizens of other states, allowing SSM to remove under diversity jurisdiction. Neither of these arguments succeed.

#### A.    Federal-officer jurisdiction

28 U.S.C. § 1442 provides the following:

> (a)  A civil action . . . that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place where it is pending:
>
>> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under the color of such office . . . .

28 U.S.C. § 1442(a). A private party seeking removal under this section must establish the following elements:

> [T]hat (1) it acted under the direction of a federal officer, (2) there is a connection between the claims and the official authority, (3) the defendant has a colorable

3

  federal defense to the plaintiffs' claims, and (4) the defendant is a "person," within the meaning of the statute.

*Minn. by Ellison v. Am. Petrol. Inst.*, 63 F.4th 703, 714 (8th Cir. 2023) (citing *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021)).

  The parties' disagreement over whether SSM can remove to federal court pursuant to federal-officer jurisdiction centers on whether SSM "acted under the direction of a federal officer." Doc. 13 at pp. 16–27; Doc. 19 at pp. 13–19; Doc. 20 at pp. 3–9. The Supreme Court instituted the standards for this first element of federal-officer removal in *Watson v. Philip Morris Cos., Inc.*: "[T]he private person's 'acting under' must involve an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior." 551 U.S. 142, 152 (2007) (citation omitted). To make this determination, federal courts must consider (1) whether a private party assisted a federal officer in the requisite way, (2) whether the assistance furthered a duty or task of the officer, and (3) whether the officer acted as the private party's superior. *See id.* at 151–57.

  First, the Supreme Court held that "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* at 152. Because compliance with the law does not rise to the level of "assistance," "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.* at 153. This rule applies "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153, 157 (finding that a tobacco company's relationship with the federal government did not rise above mere compliance, although the federal government subjected tobacco companies to "considerable regulatory detail and supervision"). *Watson* acknowledged that "lower courts have held that Government contractors fall within the terms of the federal-officer-removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving

4

detailed regulation, monitoring, or supervision." *Id.* at 153.  The Eighth Circuit holds that "[t]he assistance that private contractors provide federal officers [must go] beyond simply compliance," and that "this relationship 'typically involves subjection, guidance, or control.'" *Buljic*, 22 F.4th at 738 (alterations in original) (citations omitted).  When determining whether a party falls within the purview of federal-officer removal, *Watson* says to look for "evidence of some such special relationship," especially a delegation of authority.  551 U.S. at 157.

Second, *Watson* held that another distinctive feature of private contractors that benefit from federal-officer removal is "the fact that the private contractor in such cases is helping the Government to produce an item that it *needs*." *Id.* at 153 (emphasis added).  This sort of private contractor "helps officers fulfill other basic governmental tasks." *Id.*  For example, a private arms manufacturer helps federal officers fulfill a basic governmental task, *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020), as does a private contractor providing health benefits for government employees, *Jacks v. Meridian Resource Co., LLC*, 701 F.3d 1224, 1233 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1538 (2021), but not a meat processor acting on the direction of federal officers in "ensuring that the national food supply would not be interrupted" during the COVID-19 pandemic, *Buljic*, 22 F.4th at 739–40 (finding that "the fact that an industry is considered critical does not necessarily mean that every entity within it fulfills a basic governmental task" and that those employed in the meat processing industry "do not typically undertake work that would otherwise fall to the government").  A private party's work assists with a government task or duty where, "in the absence of a contract with a private firm, the Government itself would have had to perform" that work.  *Watson*, 551 U.S. at 153–54.

5

Third, the question of whether the federal officer acts as the private party's superior bears a close relationship with the question of assistance, as opposed to mere compliance.  *Watson* examined the plain text of § 1442(a):

> In this context, the word "under" must refer to what has been described as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office." 18 Oxford English Dictionary 948 (2d ed.1989). That relationship typically involves "subjection, guidance, or control." Webster's New International Dictionary 2765 (2d ed.1953). *See also* Funk & Wagnalls New Standard Dictionary of the English Language 2604 (1942) (defining "under" as meaning "[s]ubordinate or subservient to," "[s]ubject to guidance, tutorship, or direction of"); 18 Oxford English Dictionary, *supra,* at 949 ("[s]ubject to the instruction, direction, or guidance of").

*Watson*, 551 U.S. at 151–52.  This relationship must involve more than just "advice"; it implies some degree of "control."  *Graves v. 3M Co.*, 17 F.4th 764, 770 (8th Cir. 2021) (finding that defendant's seeking and acting on advice from a federal officer does not rise to the level of requiring government review or governmental approval).  Typically, whether the federal officer acted as the private party's superior turns on the same facts as whether the private party assisted the federal officer in the requisite way.  Together, these requirements look to whether the private party and the government official had a close relationship, defined by control and supervision by a federal superior.

This case closely parallels the recent case of *Doe v. BJC Health System*, No. 4:22-CV-00919-RWS, 2023 WL 369427 (E.D. Mo. Jan. 10, 2023).  The *BJC Health* case involved another healthcare provider that allegedly allowed Facebook and Google to peek into its patients' medical and personal information, supposedly under the auspices of federal officials.  *Id.* at *1.  As in this case, the defendant relied on *Doe I v. UPMC*, 2020 WL 4381675, at *6 (W.D. Pa. Jul. 31, 2020), where the court approved another very similar argument for federal-officer removal.  Notably, the same attorneys representing SSM here represented BJC Health in that case, and they

6

advanced an essentially identical federal-officer removal theory.  *See BJC Health*, 2023 WL 369427, at *3.  The *BJC Health* court rejected the theory:

> BJC is not assisting or helping a federal officer carry out her duties or tasks by creating a website and patient portal to allow patients online access to medical information (and allegedly transmitting their private data to third parties without their knowledge or consent).  Despite the federal government's expressed desire to encourage "the implementation of interoperable health information technology infrastructure," the statute neither authorizes nor obligates the federal government to create such an infrastructure itself.  "[W]hile the federal government may have an interest in ensuring [an interoperable health information technology infrastructure], it is typically not the duty or task of the federal government to [provide patients online access to medical information]."  *Buljic*, 22 F.4th at 740 (cleaned up) (rejecting meat processors claim that it was "acting under" the direction of the federal government while operating its facility during the pandemic).  Therefore, it cannot be said that BJC's creation of a website and online patient portal fulfills a "basic government task" that the federal government itself would otherwise be required to carry out.  This key fact distinguishes this case from *Jacks*, in which the defendant was contracted by the federal government to provide health insurance to federal workers, a task that was imposed upon the government by statute.  *See Jacks*, 701 F.3d at 1233.
>
> Nor does the receipt of incentive payments by BJC make its relationship with DHHS "less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp* [where the removing defendant successfully argued that its status as a government contractor established the acting-under element of federal-officer removal]."  *UPMC*, 2020 WL 4381675, at *5.  Neither the *UPMC* court nor BJC have explained how voluntary participation in a government program somehow brings BJC closer to "acting under" a federal officer than other private entities subject to mandatory regulation by the government, and I can discern no meaningful distinction between the two in this instance.  As noted by plaintiffs, the [MUP] does not require its voluntary participants to create online patient access to medical information to receive incentive payments, as many of the program's incentive payments are directed at areas that do not even relate to electronic health records.  Nor was BJC required by the federal government to set up its website or online patient portal in the manner alleged so as to transmit patients' private data to third parties without their knowledge or consent.  There is no indication that the government supervised or controlled the manner in which BJC built its website or patient portal.  While the government may have encouraged healthcare providers such as BJC to participate in the [MUP] by offering incentive payments, there is no evidence that it directed BJC to do so or that it required the creation of an online patient portal (especially one designed as alleged) as part of its participation in the program.  Under these facts, BJC has failed to demonstrate the type of "subjection, guidance, or control" necessary to establish federal officer removal jurisdiction in this case.

*BJC Health System*, 2023 WL 369427, at *4 (first, second, and third alterations in original).

SSM presents three arguments that the court decided *BJC Health* incorrectly, urging this Court to reach the opposite conclusion. However, SSM's arguments fail to meaningfully address either the reasoning in *BJC Health* or the *Watson* standard.

First, SSM contends that the court's analysis in *BJC Health* improperly "took issue" with BJC Health's voluntarily choosing to participate in the MUP. Doc. 19 at p. 17. However, the court did not find that the voluntariness of BJC Health's actions disqualified it from federal-officer removal but simply found that it did not help BJC Health's attempted removal. The court found that the federal government's choice to invite private parties to voluntarily participate in the program, as opposed to demanding participation, brought BJC Health no closer to a "special relationship" with a federal officer and did not establish a federal officer's "subjection, guidance, or control" of BJC Health. *Id.* ("Neither the *UPMC* court nor BJC Health have explained how voluntary participation in a government program somehow brings BJC Health closer to 'acting under' a federal officer than other private entities subject to mandatory regulation by the government, and I can discern no meaningful distinction between the two in this instance."); *see Watson*, 551 U.S. at 151, 157. This Court agrees with the analysis in *BJC Health*. Offering incentives, rather than threatening civil or criminal penalties, adds nothing to the closeness of a private party's relationship with the government. Further, this difference adds nothing to whether the government acts as the private party's superior.

SSM attempts to bolster its case by giving the history of the MUP. Doc. 19 at pp. 15–17. SSM points to the federal government's "mission to electricize health information technology"; notes that the federal government has "allocated billions of dollars" to the MUP; and says that a federal official described the MUP as a "*shared undertaking*," in which "*private stake holders*

8

[sic] *are vital*" to achieve the government's goals. *Id.* at p. 16. SSM also describes a federal officer's general advice on how to secure the incentives offered by the MUP. *Id.* at p. 20. SSM does not, however, describe any kind of "subjection, guidance, or control" by a federal official. *Watson*, 551 U.S. at 151. At best, it demonstrates "advice," which does not establish the sort of "special relationship" necessary for federal-officer removal. *Graves*, 17 F.4th at 770 ("Government advice and assistance, like the regulatory rules and requirements at issue in *Watson*, do not establish the 'acting under' relationship that § 1442(a)(1) requires."). Delegations of authority can support the existence of a "special relationship," but SSM alleges no delegation. *Watson*, 551 U.S. at 157; *see* Doc. 19. While SSM submits yearly reports of "the number of patients who have signed up for the online portal" and receives payments from the federal government, this hardly creates a special relationship between SSM and the federal government. In sum, SSM fails to shake this Court's confidence that the *BJC Health* court decided the case correctly.

Second, SSM makes several arguments to show that *BJC Health* applied the wrong legal standard. SSM argues that the court in *BJC Health* rejected the standard for federal-officer jurisdiction applied by the Third and Sixth Circuits, which is identical to the standard applied by the Eighth Circuit and Supreme Court. Doc. 19 at pp. 18–19. To support this bold proposition, SSM says that "the *BJC* court held 'these non-binding decisions apply a different test for federal-officer removal tha[n] what the Eighth Circuit Court of Appeals applies.'" *Id.* (quoting *BJC Health*, 2023 WL 369427, at *1). In SSM's brief, context indicates that *BJC Health*'s reference to "these non-binding decisions" relates to the standards used by the Third and Sixth Circuits. *Id.* However, the text of *BJC Health* makes clear that this phrase refers to "two unpublished district court opinions from Pennsylvania and Ohio," which the defendant cited in that case, *BJC*

9

*Health*, 2023 WL 369427, at *1 & n.2 (citation omitted), and which SSM cites here, Doc. 19 at p. 15.

Reviewing these cases, the Court finds the analysis in *BJC Health* more persuasive than these two district court opinions from other circuits. The decision from the Western District of Pennsylvania found that "[t]he fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide [electronic health records] network shows that the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*." *UPMC*, 2020 WL 4381675, at *6. While the government's payments do make participants in the MUP more like contractors in one way, it does not make them more like contractors in a way relevant to *Watson*'s standards: it does not independently prove any kind of "special relationship" between participants in the MUP and the federal government. *See Watson*, 551 U.S. at 157. Further, this non-binding precedent does not supply any substantive analysis of whether the MUP implicates a basic government function or whether federal officers act as the superiors of participants in the MUP. *Id.* at *3–6. So, this Court does not find this case persuasive.

Likewise, the Northern District of Ohio's decision does not persuade this Court. That decision notes that the term "acting under" is "broad and must be liberally construed," but it does not explain why participation in the MUP might amount to the sort of "special relationship" necessary for federal officer removal. *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-CV-1581, 2020 WL 7705627, at *2 (N.D. Ohio Oct. 30, 2020) (citation omitted); *see also Watson*, 551 U.S. at 147 ("The words 'acting under' are broad, and this Court has made clear that the statute must be 'liberally construed.'"). The decision does not further state why participation in the MUP qualifies as acting under a federal official. *ProMedica*, 2020 WL 7705627, at *2. Also,

10

the decision notes that *Watson*'s finding that the term "acting under" typically connotes "subjection, guidance, or control" to "one holding a superior office." *Id.* (quoting *Watson*, 551 U.S. at 151). However, it never applies that test to this case. *Id.* Similarly, that decision does not address whether participation in the MUP would support a federal officer in a basic government function. *Id.* This Court rejects *ProMedica*'s analysis and agrees with the analysis in *BJC Health*.

SSM supplements its argument that *BJC Health* failed to apply binding precedent, stating that *Watson* held that "there are a number of other circumstances . . . that are sufficient for a private entity to justify removal," including "any payment" from the federal government to a private party. Doc. 19 at p. 19 (citing *Watson* 551 U.S. at 156). This holding appears nowhere in *Watson*. *See* 551 U.S. 142. In *Watson*, the Supreme Court said that it found no "evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement" and that "[w]ithout evidence of some such special relationship, [the defendant's] analogy to Government contracting breaks down." *Id.* at 156–57. Although this suggests that government payments could count as evidence for a special relationship, this does not show that government payments standing alone can demonstrate a special relationship between the government and a private party. And even if a government payment could do so, this would hardly show that a government payment is "sufficient for a private entity to justify removal." Doc. 19 at p. 19. SSM's argument that *BJC Health* failed to apply *Watson* fails.

Finally, SSM attempts to bolster its argument that *BJC Health* applied the wrong test by quoting the correct test for federal-officer removal: "To satisfy the 'acted under' requirement of § 1442(a)(1), a private person's action 'must involve an effort to assist, or help carry out, the duties or tasks of the federal superior.'" Doc. 19 at p. 19 (emphasis in original) (citation

11

omitted).  The court in *BJC Health* applied the same standards presented in *Watson* and other binding cases.  *Compare BJC Health*, 2023 WL 369427, at *2, 4 ("[A] private person's actions must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." (citation omitted)), *with Watson*, 551 U.S. at 152 (stating the same standard).  Meanwhile, SSM's application of that standard ignores the authorities elaborating the meaning of the phrases "duties or tasks" and "federal superior."  *Compare* Doc. 19 at p. 19, *with Watson*, 551 U.S. at 152.  Its application of this standard also obscures the fact that "an effort to assist" must involve a "special relationship."  Doc. 19 at pp. 15–19.

      Third, SSM says that the court's decision in *BJC Health* incorrectly analyzed the second element of federal-officer removal, which requires that "there was a causal connection between the defendant's actions and the official authority."  *Jacks*, 701 F.3d at 1230.  SSM says that "the district court in *BJC Health* conflated the federal officer's acting under and causal nexus requirements."  Doc. 19 at p. 19.  SSM reiterates its theory that the causal-connection element requires only that a plaintiff's claims relate to actions taken by the defendant under the direction of a federal officer, and that SSM satisfies this low bar.  Doc. 19 at p. 20.  Yet, SSM's argument does not undermine or differentiate *BJC Health*'s persuasive analysis:  "Although BJC contends that it meets the second element because plaintiffs' allegations are directed, related to, or connected with its decision to create a patient portal, this argument is insufficient to meet the causal connection test because BJC Health was not 'acting under' the direction of a federal officer."  *BJC Health*, 2023 WL 369427, at *5.  The same reasoning holds for SSM.  No matter how broad the causal-connection element might be, failure to establish the acting-under element necessarily implies failure under the causal-connection element; because SSM did not act under

12

some federal authority, Doe's claims cannot possibly have any causal connection to actions taken under a federal authority.

In sum, the reasoning and holding in *BJC Health* apply with equal force to this case. First, SSM cannot demonstrate that the MUP created a special relationship between it and the federal government. Second, SSM does not show that any federal officer acted as SSM's superior, exercising control, guidance, and supervision. Simply offering monetary rewards with advice on how to secure those rewards does not typically establish one party's superior position over another. Third, SSM cannot show that it assisted a federal officer with a basic government task. Offering online access to medical records is hardly a traditional government function. Therefore, the Court rejects SSM's first attempt to establish subject matter jurisdiction, joining the growing number of courts that have rejected similar arguments in favor of federal officer removal. *See, e.g., Doe v. Mosaic Health Sys.*, No. 23-06008-CV-SJ-JAM, 2023 WL 5125078, at *2 n.5 (W.D. Mo. July 20, 2023) (collecting cases).

### B.     CAFA

Doe also moves to remand on the basis that CAFA does not support removal. That statute establishes when federal courts have diversity jurisdiction over a class action:

> The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—
>
>    (A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
>
>    (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
>
>    (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

28 U.S.C. § 1332(d)(2).  Doe defines his proposed class as follows:

13

> During the fullest period allowed by law, all Missouri citizens who are, or were, patients of SSM Health Care Corporation, or any of its affiliates and who exchanged communications at Defendant's websites, including www.ssmhealth.com and any other SSM Health Care Corporation affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

Doc. 13 at p. 29. The parties dispute whether this class includes citizens of states other than Missouri. Although the language of this class definition is less than crystal clear, the Court concludes that Doe has defined the class to include only Missouri citizens.

SSM contends that the durational clause that opens Doe's class definition modifies the phrase, "Missouri citizens," so that "a person who was a Missouri citizen at the time that he or she visited SSM Health's websites is a Missouri citizen within the plain language of the class definition—even if that Missouri citizen has since moved outside of the State." Doc. 3-1 at p. 14 (citing *Anderson v. Davis Wright Tremaine LLP*, No. 3:20-cv-01194-AC, 2021 WL 7184127, at *5 (D. Or. July 14, 2021)). According to SSM, "[t]he natural reading of this phrasing is that the putative class is comprised of any individual who was a Missouri citizen during the fullest period allowed by law, regardless of whether they have subsequently domiciled elsewhere . . . ." Doc. 19 at p. 10. SSM gives several arguments for this proposition. First, the nearest-reasonable-referent canon links the durational clause with the phrase "all Missouri citizens." *Id.* at p. 11. Second, Doe's argument that the statute of limitations should be tolled because of SSM's alleged misconduct "make[s] plain that the claims in this action should be construed and applied as broadly as possible," and "point to a broad interpretation of the putative class." *Id.* Third, because Doe did not explicitly limit his class to "current" Missouri citizens, the class can include former Missouri citizens. *Id.* at p. 12. To support this third argument, SSM cites *Anderson*, 2021 WL 7184127. The Court addresses each of these arguments in turn, finding none of them persuasive.

14

First, SSM appeals to the nearest-reasonable-referent canon, which advises that "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent." Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012). According to SSM, the phrase "all Missouri citizens" is the nearest reasonable language that the durational clause could modify. Doc. 19 at p. 11. Doe does not squarely respond to this argument. However, SSM does not convince the Court that "all Missouri citizens" is the nearest *reasonable* referent of the durational clause. According to SSM's preferred interpretation, the Court should reconstruct Doe's class definition to mean "all Missouri citizens, during the fullest period allowed by law, who are, or were, victims of SSM's alleged unlawful disclosures." However, the meaning of this reconstructed class definition remains obscure. A durational clause says when something happened, but SSM argues that the durational clause applies to the phrase "all Missouri citizens." To make this language clear, SSM needs to further reconstruct the class definition to say, "any individual who was a Missouri citizen during the fullest period allowed by law," Doc. 19 at p. 10, turning the grammatical subject "all Missouri citizens" into the verb phrase "was a Missouri citizen" and inserting "any individual" as the new grammatical subject. Given how much revision SSM's interpretation requires, its use of the nearest-reasonable-referent canon lacks sound footing. However, if the Court interprets the durational clause as stating when the interactions between SSM and the class members occurred, the meaning of the class definition becomes clear without the need for dramatic rewriting. So, SSM fails to convince the Court that "all Missouri citizens" is a reasonable referent for the durational clause.

Other canons counsel against SSM's preferred interpretation. The ordinary-meaning canon says that "[w]ords are to be understood in their ordinary everyday meanings—unless the

15

context indicates that they bear a technical sense." Scalia & Garner, *supra*, at 69.  The ordinary meaning of "all Missouri citizens" excludes all non-Missouri citizens, including all former Missouri citizens.  So, the ordinary meaning of Doe's class definition includes only Missouri citizens and excludes anyone who is merely a former Missouri citizen.  Also, the whole-text canon instructs the Court to interpret Doe's complaint as a whole.  *Id.* at 167.  Outside of his class definition, Doe repeatedly states that he intends to act as the class representative of citizens of Missouri.  Doc. 1-1 at p. 1, ¶ 4, 6.  This language clearly states that Doe brings this suit "[o]n behalf of himself and all similarly situated citizens in the state of Missouri."  *Id.* at ¶ 6.  SSM's interpretation of Doe's class definition contradicts these clear statements.  Further, the presumption-against-ineffectiveness canon says that "[a] textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."  Scalia & Garner, *supra*, at 63.  "The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered."  *Id.*  Because courts should interpret a text in light of the surrounding text, a court should also interpret a text in light of the purpose manifest in the surrounding text.  *Id.*  Doe's class definition appears shortly after a section arguing that "[t]he applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein."  Doc. 1-1 at ¶ 141.  If the Court reads the durational clause as modifying Doe's description of SSM's alleged wrongdoing, then the vague durational clause serves a clear purpose:  whatever the result of Doe and SSM's dispute over the appropriate statute of limitations, Doe's class includes only claimants with unbarred claims.  Likewise, if the Court were to read "all Missouri citizens" to include some former Missouri citizens, this would frustrate the manifest purpose of the class definition:  Doe filed in Missouri court, intending to prosecute his claim under Missouri's jurisdiction.  *See* Doc. 1-1 at ¶ 150.  To read "all Missouri

16

citizens" as including non-Missouri citizens would frustrate the purpose manifest in the text of the class definition. Assuming that "[d]uring the fullest period allowed by law" modifies "all Missouri citizens," what legal principles would determine when a class member needs to have been a Missouri citizen? The Court does not know, and SSM provides no help. Doc. 19 at p. 11. So, Doe's reading of the class definition furthers the function of the text, while SSM's reading frustrates and obscures that function. Therefore, the canons of interpretation support Doe, not SSM.

Second, SSM says that Doe's argument that the "applicable statutes of limitations have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein," demonstrates that "the claims in this action should be construed and applied as broadly as possible." Doc. 19 at p. 11 (quoting Doc. 1-1 at ¶ 141). SSM seems to argue that, because Doe's complaint seeks to narrow the scope of the statute of limitations, broadening the number of class members with viable claims, the Court should interpret the class definition as seeking to establish the broadest class possible. *Id.* Doe does not respond to this argument. Doc. 20 at p. 1–3. However, SSM's reasoning does not persuade the Court. Doe's argument that SSM's actions tolled the statute of limitations does not stand in tension with his stated intention to represent exclusively Missouri citizens. So, SSM's argument fails.

Third, SSM argues that "all Missouri citizens" includes former Missouri citizens because Doe did not limit the class to "current" Missouri citizens. Doc. 19 at p. 12–13. To support this point SSM cites *Anderson*, 2021 WL 7184127. Doc. 19 at pp. 12–13. In that case, the plaintiff defined the proposed class as "each Oregon citizen who was sold a security issued by American Equities in one of the Funds in violation of the Oregon Securities Law and is owed money by American Equities . . . ." *Anderson*, 2021 WL 7184127, at *1. The court held that, because the

17

definition did not include the word "current," the phrase "each Oregon citizen" included some former Oregon citizens. *Id.* at *5. SSM says that this Court should likewise interpret "all Missouri citizens" as including former Missouri citizens because Doe did not use the word "current." Doc. 19 at p. 12. Doe responds that "[u]nlike in *Anderson*, the class definition does not include individuals who may have once resided in Missouri, but rather is limited to individuals who were Missouri residents at the time of the filing." Doc. 20 at p. 3. Doe further argues that "SSM's theory that the phrase 'during the fullest period allowed by law' in the class definition broadens the class to include non-Missouri citizens in the class is wholly unsupported by any authority and contrary to the plain language of the class definition." *Id.* This Court agrees that "all Missouri citizens" excludes any former Missouri citizen. If *Anderson* is analogous—and SSM has not persuaded the Court that it is—this non-binding precedent does not overshadow the ordinary meaning of "all Missouri citizens." Therefore, the Court rejects SSM's argument that CAFA gives this Court diversity jurisdiction over this case.

**IV.     Conclusion**

The Court concludes that neither the federal-officer-removal statute nor CAFA establishes this Court's subject matter jurisdiction over this case. Accordingly, the Court grants Plaintiff John Doe's [13] Motion to Remand and remands this case to the Circuit Court for the City of St. Louis. Pursuant to 28 U.S.C. § 1447(c), the Court directs the Clerk of Court to mail a certified copy of this Order of Remand to the clerk of the state court.

So Ordered this 22nd day of August 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE